CARAWAY, J.
 

 |! Roderick Moore was convicted of one count of distribution of cocaine and one count of distribution of hydrocodone. He was sentenced to concurrent sentences of 15 years at hard labor for the cocaine conviction, with 5 years of the sentence imposed without benefit of parole, probation, or suspension of sentence, and 5 years at hard labor for the hydrocodone conviction. Moore now appeals. We affirm the convictions on both counts. Moore’s sentence on the hydrocodone distribution conviction is affirmed and his sentence for the cocaine distribution conviction is affirmed as amended.
 

 Facts
 

 Roderick Moore, a 17-year veteran Shreveport police officer, was arrested for distributing cocaine and hydrocodone to a local club dancer on November 1, 2007. The Shreveport Police Department had received information from a number of different confidential sources that Moore was engaging in illegal drug activity throughout the City of Shreveport. On October 29, 2007, Mary Ann Johnson (“Johnson”), a dancer at a local club, informed Detective Jack Miller (“Miller”), of the Shreveport Police Department vice unit, that Moore had given her Xanax the day before which she claimed to have discarded. With the supervision of law enforcement, Johnson participated in a recorded telephone conversation with Moore who implicated himself in illegal drug activity both in the conversation and in subsequent messages left for Johnson on her cell phone. Police opened an investigation and ultimately decided to set up a controlled buy/bust ^operation between Moore and Johnson at
 
 *1140
 
 her place of employment, Larry Flynt’s Hustler Club-Shreveport (“Deja Vu”), in Shreveport. Through video surveillance, police observed a hand-to-hand transaction take place between Johnson and Moore. Johnson claimed that Moore gave her illegal drugs and she transferred the substances, later determined by laboratory testing to be cocaine and hydrocodone, to police. Moore was arrested and charged with two counts of distribution of illegal drugs. He admitted that he talked to Johnson about drugs, but denied distributing anything to her. A jury convicted Moore of the charged offenses. The court denied Moore’s motion for a post verdict judgment of acquittal and he waived sentencing delays. After sentencing, this appeal followed.
 

 Discussion
 

 I.
 

 Three of defendant’s assignments of error relate to the sufficiency of the evidence for conviction.
 
 [1]
 
 Moore argues that the circumstantial evidence was not sufficient to convict him because “no one could see what was allegedly passed to the informant,” by the defendant inside the club. In an environment ridden with drug activity which had not been comprehensively searched, Johnson was not kept under constant surveillance. Thus, Moore argues that the drugs Johnson produced to the officers cannot be linked to |3him. Moore also attacks Johnson’s credibility concerning her testimony of a previous drug incident, her inconsistent description of the drugs she allegedly received from Moore, her inconsistent statements about an argument with another employee, and her attempts to gain notoriety for personal ambitions with the Shreveport Police Department. Moore also seeks to discredit the testimony of Miller on the basis of his inconsistent description of incidents before, during and after the transaction.
 

 Cocaine is classified as a Schedule II CDS, and it is unlawful for any person to knowingly or intentionally distribute or dispense .a Schedule II CDS.
 
 See,
 
 LSA-R.S. 40:964(A)(4) and 40:967(A)(1). Hy-drocodone is defined as a Schedule III CDS. La. R.S. 40:964(D)(l)(d). To present sufficient evidence of distribution of a CDS, the state must prove the following elements: (1) delivery or physical transfer of the CDS to its intended recipient; (2) guilty knowledge of the CDS at the time of the transfer; and (3) the exact identity of the CDS.
 
 State v. Braziel,
 
 42,668 (La.App. 2 Cir. 10/24/07), 968 So.2d 853;
 
 State v. Kelley,
 
 36,602 (La.App. 2d Cir.1/29/03), 836 So.2d 1243;
 
 State v. Manning,
 
 30,809 (La.App. 2d Cir.6/24/98), 715 So.2d 668.
 

 The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. On appeal, a reviewing court must view the evidence in the light most favorable to the state and must presume in support of the judgment the existence of every 14fact the trier could reasonably deduce from the
 
 *1141
 
 evidence.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 

 This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 05-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Dotie,
 
 43,819 (La.App. 2d Cir.1/14/09), 1 So.3d 833. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Eason,
 
 43,788 (La. App. 2d Cir.2/25/09), 3 So.3d 685;
 
 State v. Hill,
 
 42,025 (La.App. 2d Cir.5/9/07), 956 So.2d 758,
 
 unit denied,
 
 07-1209 (La.12/14/07), 970 So.2d 529.
 

 The
 
 Jackson
 
 standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983);
 
 State v. Speed,
 
 43,786 (La.App. 2d Cir.1/14/09), 2 So.3d 582.
 

 | -,Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.
 
 State v. Speed, supra; State v. Robbins,
 
 43,129 (La.App. 2d Cir.3/19/08), 979 So.2d 630. For a case resting essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438.
 

 Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency.
 
 State v. Speed, supra; State v. Allen,
 
 36,180 (La.App. 2d Cir.9/18/02), 828 So.2d 622,
 
 writs denied,
 
 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255,
 
 cert. denied,
 
 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
 

 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion.
 
 State v. Gullette,
 
 43,032 (La. App. 2d Cir.2/13/08), 975 So.2d 753;
 
 State v. Burd,
 
 40,480 (La.App. 2d Cir.1/27/06), 921 So.2d 219,
 
 writ denied,
 
 06-1083 (La.11/9/06), 941 So.2d 35. Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant.
 
 State v. Robinson,
 
 384 So.2d 332 (La.1980);
 
 State v. Ponsell,
 
 33,543 (La.App. 2d Cir.8/23/00), 766 So.2d 678,
 
 writ denied,
 
 00-2726 (La.10/12/01), 799 So.2d 490.
 

 |/The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law.
 
 State v. Casey,
 
 99-0023 (La.1/26/00), 775 So.2d 1022,
 
 cert. denied,
 
 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
 

 A motion for post verdict judgment of acquittal shall be granted only if the court
 
 *1142
 
 finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilt. La. C.Cr.P. art. 821. This is a question of legal sufficiency of the evidence.
 
 State v. Combs,
 
 600 So.2d 751 (La.App. 2d Cir.1992),
 
 writ denied,
 
 604 So.2d 973 (La.1992).
 

 The testimony and evidence presented at Moore’s trial included the testimony of Miller and Agent Henry Whitehorn, Jr. (“Whitehorn”), of the Caddo-Shreveport Narcotics Unit. These officers worked with Johnson in the investigation of Moore. Miller explained that in the course of his work, he came into contact with Johnson.
 
 [2]
 
 At the time of Moore’s arrest Johnson worked at Deja Vu, a nightclub in Shreveport. Johnson called Miller on Sunday, October 29, 2007, and told him that she had disposed of Xanax given to her by a law enforcement officer on October 28, 2007, because she did not use drugs. Ultimately Miller contacted Whitehorn. Whitehorn testified that Moore had been suspected of drug activity prior to this incident.
 

 17Upon determining that Johnson was credible as a confidential informant,
 
 [3]
 
 Miller and Whitehorn had Johnson place a phone call to Moore which was recorded. During the phone call, Moore talked about taking Xanax and mentioned that he knew how long it would take in order to pass a drug test after taking Xanax. Moore also told Johnson,
 
 “I got some
 
 powder.”
 

 Both officers testified that Moore also left voice messages on Johnson’s cell phone voice mail. Copies of these messages were entered into evidence. Miller recalled that in one of the messages, Moore stated, “Call me. Maybe you can ride the bike.” Moore also used the phrase “ride the horse” and referred to “the white horse.” The messages entered into evidence corroborate that testimony. At trial, Miller and Whitehorn explained that “powder” is a street name for cocaine; “white horse” most often refers to powder cocaine;
 
 [4]
 
 and “handlebars” is a “street name” for Xanax. Further, when speaking about Xanax in these terms, the officers testified that individuals may say things such as “I’ve got some handlebars you can ride” or “you can come ride the bike.”
 

 After these telephone recordings, officers opened an investigation and ultimately decided to set up a controlled buy/bust operation with the defendant at Deja Vu. Miller and Whitehorn testified that they were present when Johnson placed a call to Moore on November 1, 2007, telling him that |sshe wanted to meet to possibly obtain narcotics. Moore agreed. The recorded conversation was submitted into evidence and substantiated the planned meeting.
 

 Whitehorn testified that two agents were stationed near Moore’s residence in
 
 Princeton,
 
 Louisiana.
 
 [5]
 
 The officers ob
 
 *1143
 
 served Moore leaving the residence. Whitehorn testified that he and two other agents were stationed downtown on the parking garage roof across from the club while two other agents were placed inside the club. Whitehorn observed Moore enter Deja Vu.
 

 Miller testified that he searched Johnson’s person, bag, and vehicle immediately prior to her entering the club before the transaction. Johnson went directly into the dressing room to change into work clothes. Her locker in the dressing room had not been previously searched by the officers.
 
 [6]
 
 Miller testified that he had made arrangements with the club owner to utilize video monitors in the dressing room. Miller testified that he and Agent Allan Alkire observed Johnson while she changed clothes. Miller also testified that Johnson was not equipped with audio equipment or a wire because in a club setting the music and background noise are so loud that attempts to record conversations would be unsuccessful.
 

 | ¡)MiIler testified that he and Agent Al-iare were in the surveillance room of Deja Vu when the transaction between Johnson and Moore took place. Miller estimated that there were approximately 80 cameras in the club at the time of the interaction between Johnson and the defendant. Two recordings were made of the interaction; one on the club’s monitor, and one made by Miller, who was recording the club’s monitor with a hand-held camera.
 

 Miller testified that he saw Moore enter the business and take a seat at the bar. After another employee of the bar approached and left Moore, Johnson then made contact with the defendant, sitting next to him at the bar. Johnson was in her work clothing, and was carrying a cell phone and a towel.
 
 [7]
 

 Miller testified that after Johnson and Moore had talked for a few minutes, Moore stood up and put his right hand into his pocket. Moore removed his hand from his pocket with his fist closed. Moore then put his closed fist on top of Johnson’s opened hand and opened his hand.
 
 [8]
 
 Miller testified that Johnson closed her hand, and the defendant took his open hand away. Miller did not see what was in Johnson’s hand, but he testified that she then placed her hand under her leg while remaining seated at the bar. The video of the interaction corroborated Miller’s testimony. The video does not show what, if anything, was passed from Moore to Johnson’s hand.
 

 ImMiller testified that after the transaction, Johnson returned to the dressing room and entered the bathroom which was unmonitored. There she called Miller on her cell phone. Miller testified that he
 
 *1144
 
 instructed her to go into the dressing room where there were video monitors and to await further instructions from him. Ultimately, Johnson gave two small baggies to Miller in the security room.
 

 After the incident, Miller made two audio recordings of Johnson’s description of the transaction which were admitted into evidence. Miller testified that in the audio recordings, Johnson told him that Moore had given her a Lortab pill and powdered cocaine mixed with Lortab. The audio recordings confirm this testimony. Moreover, in the recordings, Johnson stated that Moore told her he also had drugs at his home.
 

 The officers instructed Johnson to go back and sit next to Moore while they determined what to do next. Miller testified that the officers directed the owner of the club to remove Johnson out of the area. As soon as Johnson was removed from the area, Miller and Agent Alkire arrested Moore. Miller testified that no drugs were found on Moore’s person or in his vehicle.
 

 Johnson also testified at trial. She testified that on October 28, 2007, Moore had given her two Xanax bars which she flushed down the toilet. She then met with Miller and Whitehorn. She testified concerning the phone recordings of Moore. In the recorded phone conversation, Moore referred to “powder” and Johnson told Moore to bring her powder. Afterwards the two met at Deja Vu where he transferred drugs to her. |uJohnson testified that Moore gave her powder cocaine mixed with Lortab, as well as a Lortab pill in small bags.
 
 [9]
 
 Johnson testified that after Moore gave her the drugs, she placed her closed hand under her leg. She testified that after leaving the bar she went into the dressing room and called Miller. Johnson eventually met with Miller and turned the drugs over to him.
 
 [10]
 
 Johnson denied drug use although she admitted to seeing both Xanax and Lortab at Deja Vu. Johnson confirmed that Miller did not search her dressing room locker.
 

 Moore made a statement to one of the arresting officers, Officer Carl Townley,
 
 [11]
 
 that he had spoken with Johnson, and had mentioned drugs to her, but said that he “would do anything ... to get in their pants!” Moore denied distributing the drugs.
 

 After Moore’s arrest, a search warrant was procured to search his home in Bossier Parish. Whitehorn and Sergeant Clifton Lindsay, of the Shreveport Police Department, were present when the Bossier authorities executed the warrant. Both officers testified that at the time of the search, Moore’s daughter, Kammi Moore, was present at the residence. The officers confirmed that a briefcase, secured with a combination lock, was found in Moore’s bedroom. Moore’s badge number unlocked the briefcase which contained what appeared to the officers to be marijuana, cocaine, Lortab, Xanax, and various other prescription medications. Whitehorn | ^testified that rolling papers and baggies were also in the briefcase.
 
 [12]
 
 Laboratory testing later revealed that the substances
 
 *1145
 
 in the briefcase contained the following controlled substances: oxycodone; marijuana; hydrocodone (Lortab); methadone; lorazepam; alprazolam (Xanax); and cocaine.
 

 Moore’s daughter, Kammi Moore, testified at trial. Ms. Moore was interviewed by officers one day after the search of Moore’s residence. At trial, a portion of the taped video of the officers’ interview of Ms. Moore was reviewed with her and introduced into evidence. In the statement, Ms. Moore admitted that she had seen her father with large amounts of cocaine and money and that the drugs found in the briefcase belonged to him. She also stated her knowledge of the fact that her father gave drugs to club dancers in exchange for sexual relations. Ms. Moore also admitted that she witnessed her father packaging drugs in small baggies at his home. On cross-examination, Ms. Moore testified that she felt pressured by the officers to make these statements. She believed that if she did not cooperate, she would be arrested and would lose her daughter.
 

 Marcelle Liversage was the sole witness called on Moore’s behalf. Liversage testified that she was employed at Deja Vu until June 2007 as a “house mom” in charge of the dressing room. Liversage also stated that one of her duties was to make sure that none of the dancers was using drugs or drinking alcohol. Liver-sage estimated that “about ninety percent of the girls were using drugs and selling them.” She testified that the dancers’ lockers, 113which were in the dressing room, had key or combination locks. The lockers were only accessible by the dancers unless management requested that the lockers be opened. Liversage sometimes saw the dancers open their lockers, exchange cash and engage in hand-to-hand transactions.
 

 Liversage testified that Johnson had once asked her for pain medicine and that she had offered over-the-counter pain products. Liversage testified that she saw Johnson speak with another dancer, who handed Johnson a “long, white pill” from a brown prescription bottle. Liversage concluded that the pill had been a Lortab, because “that’s what all the girls used.” Liversage explained that the use of Lortab was very common at the club.
 

 Contrary to Moore’s contentions that the state’s case rests primarily on circumstantial evidence of the alleged drug transaction inside Deja Vu, direct evidence of the transaction was reported in Johnson’s testimony and demonstrated by her production of the cocaine and Lortab to the officers. There is also a large body of circumstantial evidence demonstrating the absence of internal contradiction and irreconcilable conflict between Johnson’s description of the drug transaction and what can be inferred by such circumstantial evidence. Moore’s telephone conversations with Johnson in advance of their encounter suggested that drugs would be produced by Moore. The surveillance of Johnson from the time of her entry into the club until her delivery of the drugs to Miller inside the club does not contradict her account of the transaction. The video of the transaction itself suggests that something was delivered hand-to-hand from Moore to Johnson. Finally, the evidence concerning Moore’s leaving his home in 114which cocaine, hydrocodone and other drugs were found circumstantially demonstrates Moore’s ability to complete the transaction that evening at the club as Johnson described. The testimony of Johnson, aided by this large body of circumstantial evidence confirming the transaction and removing any questions regarding her credibility, was clearly believed by the jury as direct evidence of the drug
 
 *1146
 
 transaction and is sufficient beyond a reasonable doubt to prove the distribution of the two drugs and the convictions.
 

 Likewise, Moore’s argument that drugs of an “unknown origin” were delivered by Johnson to the officers in the club has no merit. He bases this argument on the surveillance of Johnson and her ability to possibly obtain those drugs by other means inside the club. The evidence concerning the officers’ observations of Johnson shows that the officers first searched Johnson and her bag before she entered the club. After she entered the establishment, two officers continually monitored her from the time she changed clothes until she approached Moore. The officers observed no other individual in the dressing room at that time. After the transaction, the officers again monitored Johnson as she entered the dressing room. From the dressing area, the officers lost sight of Johnson upon her entry into the bathroom for a “few seconds” while she phoned Miller. She was instructed by Miller to immediately return to the dressing room so that the officers could monitor her. Johnson was monitored by the officers until she was instructed to bring the drugs to the security room where the officers were located. While this review indicates certain brief opportunities for Johnson to have obtained the drugs from her locker or the bathroom, the jury could |1fiweigh those instances along with the entirety of the surveillance evidence. The great weight of the evidence reveals the hand-to-hand exchange between Johnson and Moore as the time when she obtained the drugs. Johnson knew she was under surveillance in the club. The video evidence of the exchange between Johnson and Moore along with all the other circumstantial evidence described above could be weighed by the jury and overwhelmingly supports the jury’s acceptance of Johnson’s testimony of her receipt of the drugs from Moore.
 

 Finally, the instances of certain inconsistencies in the details surrounding the crime by both Johnson and Miller were minor in nature and did not serve to discredit then- descriptions of the overall criminal transaction by Moore. Johnson’s attempts to obtain employment with the police department were matters concerning her credibility which were before the jury for consideration. The appellate court may not impinge on the discx-etion of the jury regarding these issues of credibility of the witnesses.
 

 The defendant’s assignments of error pertaining to the sufficiency of the evidence have no merit.
 

 II.
 

 Moore argues that the introduction of the evidence of the search of his home and the charges subsequently brought in Bossier Parish represent impermissible “other crimes” evidence which prejudiced his case and should have been excluded from evidence. After a pretrial hearing raising this issue, the trial court ruled the evidence admissible. Before the court, | lfiMoore argued that the “other crimes” evidence should be inadmissible due to the extreme prejudicial nature of the evidence and the risk that Moore would be convicted of the present offense based upon that evidence.
 

 Generally speaking, evidence pertaining to the defendant’s commission of crimes, wrongs or acts, other than the one with which he is currently charged, is inadmissible, when the only purpose of such evidence is to prove the defendant’s character and thus his subsequent disposition to break the law. La. C.E. art. 404;
 
 State v. Harrison,
 
 604 So.2d 583 (La.9/2/1992);
 
 State v. Humphrey,
 
 412 So.2d 507 (La.1981). The exceptions to
 
 *1147
 
 this general rule are listed in La. C.E. art. 404(B)(1), which provides as follows:
 

 [EJvidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or
 
 when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
 

 The last phrase of the concluding sentence of Article 404(B)(1), as emphasized above, delineates between those “other crimes” which are not an integral part of the act or transaction that is the subject of the present proceeding and those that are an integral part. Those criminal acts that constitute an integral part of the transaction which is the subject of prosecution are referred to as
 
 res gestae
 
 events.
 
 State v. Taylor,
 
 37,356 (La.App. 2d Cir.9/26/03), 855 So.2d 958,
 
 unit denied,
 
 03-3141 (La.3/19/04), 869 So.2d 848.
 

 Res gestae
 
 events constituting other crimes evidence are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them. A close proximity in time and location is required between the charged offense and the other crimes evidence to insure that the purpose served by admission of other crimes evidence is not to depict defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.
 
 Id.
 
 at 961.
 

 From our review of the circumstances surrounding the search of Moore’s home in Bossier, we consider the evidence of Moore’s drug activities in his home as conduct that constitutes an integral part of the transaction which occurred at Deja Vu and therefore admissible under our
 
 res gestae
 
 rule. Significantly, Moore did not seek to suppress the evidence obtained by the execution of the search warrant of his home. The justification for the issuance of such a warrant was reviewed by our supreme court in
 
 State v. Profit,
 
 00-1174 (La.1/29/01), 778 So.2d 1127, 1130-1131, as follows:
 

 The task of a court reviewing that judgment is simply to “ensure that the magistrate had ‘a substantial basis for ... concluding]’ that probable cause existed.”
 
 [Illinois v.] Gates,
 
 462 U.S. [213] at 239, 103 S.Ct. [2317] at 2332[, 76 L.Ed.2d 527 (1983) ] (quoting
 
 Jones v. United States,
 
 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (I960)). In the present case, the amount of marijuana seized after the chase, far more consistent with trafficking than with personal use only, together with a reasonable basis to believe that respondent had attempted to mislead the officers with regard to the location of his residence until he was corrected by |1Rhis passenger and the information on his own driver’s license, and respondent’s previous involvement with marijuana reflected in his prior arrests and conviction, supported a reasonable, common sense inference made by the magistrate that the officers had a fair probability of finding additional amounts of the drug on the premises at 4601 St. Bernard Ave. See
 
 United States v. Reddrick,
 
 90 F.3d 1276, 1281 (7th Cir.1996) (a magistrate may infer that “in the case of drug
 
 *1148
 
 dealers evidence is likely to be found where dealers live (internal quotation marks and citation omitted);
 
 United States v. Riedesel,
 
 987 F.2d 1383, 1391 (8th Cir.1993) (lawful seizure of drugs from defendant’s car provides probable cause to support issuance of a warrant to search his home);
 
 United States v. Robins,
 
 978 F.2d 881, 892 (5th Cir.1992) (sufficient nexus existed between marijuana seized from vehicle and defendant’s residence to establish probable cause for a warrant to search the premises because “[a] residence is a quite convenient, commonly-used place for planning continuing criminal activities like large-scale marijuana trafficking and money laundering.”);
 
 United States v. Angulo-Lopez,
 
 791 F.2d 1394, 1399 (9th Cir.1986) (a magistrate is “entitled to draw reasonable inferences,” including that drug dealers have drugs “where the dealers live,” and when traffickers consist of ringleader and assistants a sufficient “probability exists that drugs will be at the assistants’ residence as well as the ringleader’s.”); see also
 
 State v. Johnson,
 
 256 Neb. 133, 589 N.W.2d 108 (1999) (“[A] common thread among these cases is that the affidavit provides factors establishing that the defendant was a drug dealer as opposed to someone in possession of drugs for personal use.”).
 

 The drug transaction began after Moore’s suggestions over the phone to Johnson concerning drugs. He was placed under surveillance by the police upon leaving his home and driving to Deja Vu. The transaction occurred inside Deja Vu, was witnessed from the security room by officers, and confirmed by Johnson who delivered the drugs to the police. Upon his arrest, Moore denied distributing drugs to Johnson. The immediate search warrant obtained for the search of Moore’s home was based upon this nexus of the events, and the evidence of drug distribution discovered in the homejjgwas relevant and admissible for proof of a continuous chain of events related to the charged crimes.
 

 Defendant’s argument that the evidence obtained from the search of his home was inadmissible “other crimes” evidence is without merit.
 

 Error Patent:
 

 For the conviction of distribution of a Schedule II CDS, cocaine, Moore received a sentence of 15 years of imprisonment at hard labor, 5 of which were ordered to be served without benefit of parole, probation, or suspension of sentence. The version of La. R.S. 40:967(B)(4)(b) in effect at the time of the crime on November 1, 2007, provided that only the first two years of the sentence be imposed without benefit of parole, probation or suspension of sentence.
 

 Accordingly, we will amend the sentence to set aside that portion which provides for a period in excess of two years to be served without benefit of parole, probation or suspension of sentence. La.C.Cr.P. art. 882;
 
 State v. Malone,
 
 31,726 (La.App. 2d Cir.1/20/99), 728 So.2d 500. The minute entry for sentencing is hereby corrected to provide that the first two years of the sentence be served without benefit of parole probation or suspension of sentence.
 

 Conclusion
 

 For the foregoing reasons, Moore’s conviction and sentence for Distribution of a Schedule III, hydrocodone is affirmed. His conviction for Distribution of a Schedule II, cocaine is affirmed. His sentence for this offense is amended to delete that portion of the sentence which provides for lana period in excess of two years be served without benefits, and, as amended, is affirmed.
 

 
 *1149
 
 CONVICTIONS AND SENTENCE AFFIRMED; SENTENCE AFFIRMED AS AMENDED.
 

 [1]
 

 . In addition to defendant's first assignment of error specifically regarding sufficiency, defendant's fourth assignment of error relates to his motion for post verdict judgment of acquittal, by which he argues that the lack of constant surveillance of Johnson while in the club leaves her later production of the drugs unlinked to the defendant and highly circumstantial. Defendant's second assignment of error likewise questions the relevance of the drugs produced by Johnson to the police after her encounter with defendant in the club. While defendant asserts that those drugs, which were subject to his pretrial motion to suppress, must be suppressed, the issue raised goes to the relevance of the drugs and their sufficiency concerning the issue of defendant’s distribution of them to Johnson, instead of a fourth amendment violation.
 

 [2]
 

 . Johnson twice unsuccessfully applied to work with the Shreveport Police Department. Miller wrote a letter of recommendation for Johnson.
 

 [3]
 

 . Testimony established that although Johnson was not initially offered nor expected any compensation for her work for the police, after Moore’s arrest, she was paid $2000 in cash by the Shreveport Police Department.
 

 [4]
 

 . Whitehorn testified that Moore kept horses behind his house but he did not recall whelher any of those horses were white. Sergeant Clifton Lindsay testified that there were two horses behind the defendant's house, but that they were dark in color or "bay.”
 

 [5]
 

 .Lieutenant Richard Childers, the supervising officer of Moore's investigation, testified that agents had been posted at Moore's residence to follow him from the residence to the club to determine whether Moore made any stops between the residence and the club. Sergeant Mark Davis was one of those officers
 
 *1143
 
 and corroborated Childers' testimony that Moore made no stops between his home and the club.
 

 [6]
 

 .Davis, a sergeant with the Shreveport Police Department assigned to the DEA drug enforcement task force, testified that although a search of Johnson's locker would have been a better practice, the decision to do so is based upon the circumstances and possibility of jeopardizing the operation. In rebuttal testimony, Davis concluded that in this case, it would not have been feasible to search the locker without compromising the investigation. He also testified that in his opinion, standard operating procedure was followed in this case.
 

 [7]
 

 . Johnson initially testified that she did not remember whether she had carried a towel on this particular occasion, but that she usually did. After the state refreshed Johnson’s memory by showing her the video of the transaction, Johnson confirmed that she had been carrying a towel.
 

 [8]
 

 . On cross-examination, Defective Miller admitted that he had at an earlier hearing erroneously testified that Moore used two hands to effect the transaction.
 

 [9]
 

 . Lortab is a trade name for a combination of acetaminophen and hydrocodone.
 
 See In re Alford,
 
 07-1893 (La.2/15/08), 977 So.2d 811, 837-838.
 

 [10]
 

 . The drugs given to Miller were introduced into evidence. An expert from the North Louisiana Crime Lab analyzed the drugs and testified that the drugs were cocaine and a pharmaceutical preparation containing hy-drocodone.
 

 [11]
 

 . Officer Townley's testimony setting forth these facts was stipulated at trial.
 

 [12]
 

 . Supervising Officer Childers corroborated Whitehorn's and Lindsay's testimony regarding the search of Moore's residence.