CARAWAY, J.
|! Frank Washington was convicted by a jury of one count of distribution of cocaine and sentenced to 20 years at hard labor, the first two years of which are to be served without benefit of probation, parole, or suspension of sentence. Washington appeals his conviction and sentence. We affirm.

Facts

In May 2010, the Minden Police Department Narcotics Unit conducted an undercover narcotics operation in Webster Parish. Lieutenants Dan Weaver (‘Weaver”) and Marvin Garrett (“Garrett”) met with a confidential informant, Joseph Howard (“Howard”), who told them he knew where he could buy cocaine. Howard was searched for drugs and money and then fitted with an audio and video recording device for recording the drug buy. The officers gave Howard $100 in bills with recorded serial numbers to buy the drugs. He was instructed to meet the officers at a specified location after the drug buy.
On May 19, 2010, after first attempting to buy drugs from defendant’s brother, Ervin Washington (hereinafter “Ervin”), Howard went to defendant’s home to buy drugs. After a conversation, Washington went alone behind the house and then returned back to Howard. Howard then went to the same location behind the house where Washington had gone and on a shelf in a tree found five rocks of what appeared to be crack cocaine. He left the money on the shelf, took the cocaine and returned the drugs to the officers.
^Washington was arrested and charged with three counts of distribution of a Schedule II controlled dangerous substance.[1] On January 26, 2011, Washington was tried by jury on count three which involved the sale of drugs to Howard on May 19, 2010.
By 11-1 vote, the jury returned a verdict of guilty. Washington’s counsel filed a timely motion for post-verdict judgment of acquittal and Howard filed an untimely pro se motion for new trial. Both motions were denied at the sentencing hearing on March 28, 2011. Washington was sentenced to 20 years at hard labor, the first two years of which were to be served without benefit of probation, parole, or suspension of sentence. He filed a motion to reconsider sentence, which was also denied. This appeal ensued.

Discussion

I.
Washington argues that the evidence was insufficient to support his conviction on the grounds that the state failed to prove that he ever had contact with the substance behind the house or was ever *700 found in possession of the money used to make the purchase. Further, Washington contends that there was insufficient evidence that the substance received by Howard was cocaine. Finally, Washington argues that the lack of evidence regarding who put the cocaine on the shelf allows the possibility that it was Howard who did so after surreptitiously obtaining the alleged cocaine from another person with whom he made contact before reaching Washington’s house.
^Additionally, Washington argues discrepancies between what was shown on the video and the testimony at trial. He contends that Howard made stops after leaving the officers at two different apartments before the alleged drug transaction. Washington also argues that the video shows that after he walked away from Howard, he was never seen on the video again.
La. R.S. 40:967(A) states in pertinent part as follows:
Except as authorized by this Part or by Part VII-B of Chapter 5 of Title 40 of the Louisiana Revised Statutes of 1950, it shall be unlawful for any person knowingly or intentionally:
(1) To produce, manufacture, distribute, or dispense or possess with intent to produce, manufacture, distribute, or dispense, a controlled dangerous substance or controlled dangerous substance analogue classified in Schedule II.
[[Image here]]
(4)(b)Distribution ... cocaine or cocaine base or a mixture or substance containing cocaine or its analogues as provided in Schedule 11(A)(4) ... shall be sentenced to a term of imprisonment at hard labor for not less than two years nor more than thirty years, with the first two years of said sentence being without benefit of parole, probation, or suspension of sentence; and may, in addition, be sentenced to pay a fine of not more than fifty thousand dollars.
An individual is guilty of distribution of cocaine when he transfers possession or control of the cocaine to his intended recipient. The State must show: (1) delivery or physical transfer; (2) guilty knowledge of the controlled dangerous substance at the time of transfer; and (3) the exact identity of the controlled dangerous substance. State v. Marshall, 45,567 (La.App.2d Cir.9/22/10), 47 So.3d 1083, writ denied, 10-2411 (La.2/25/11), 58 So.3d 457; State v. Kelley, 36,602 (La.App.2d Cir.01/29/03), 836 So.2d 1243; State v. Manning, 30,809 (La.App.2d Cir.06/24/98), 715 So.2d 668.
|4When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The Jackson standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09- *701 0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
 UThe trier of fact is charged to make credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). A witness’s testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. State v. Dorsey, 10-0216 (La.9/7/11), 74 So.3d 603; State v. Davis, 02-1043 (La.6/27/03), 848 So.2d 557. In the absence of internal contradiction or irreconcilable conflict with physical evidence, that witness’s testimony, if believed by the fact finder, is sufficient support for a requisite factual conclusion. State v. Dorsey, supra; State v. Robinson, 02-1869 (La.4/14/04), 874 So.2d 66.
 The Jackson standard is applicable in cases involving both direct and circumstantial evidence. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Moore, 44,429 (La.App.2d Cir.8/26/09), 20 So.3d 1137, writ denied, 09-2166 (La.4/9/10), 31 So.3d 378; State v. Robbins, 43,129 (La.App.2d Cir.3/19/08), 979 So.2d 630. When the conviction is based on circumstantial evidence, such evidence must exclude any reasonable hypothesis of innocence. La. R.S. 15:438.
| (At trial, Garrett testified that on May 19, 2010, he contacted Howard for the purpose of making a purchase of illegal narcotics, namely crack cocaine. The officer testified that he and his partner, Weaver, first met Howard behind the Min-den Press Herald and took him to the police department. The officers then prepared Howard to make the buy of the illegal drugs by patting him down, searching him to make sure he did not have any weapons or illegal narcotics or any other money on his person. The officers instructed the informant to make the purchase and return directly to a pre-ar-ranged location. The original target of the drug buy apparently was Washington’s brother, Ervin.[2]
Initially, Garrett went to a nearby location where the purchase was to take place to set up surveillance. Weaver then activated the video equipment attached to Howard, gave Howard money for the purchase, and dropped him off. Garrett explained that the police used a video camera and an audio system on the informant that transmits the audio signal to the police vehicle so the informant’s actions are monitored.
Garrett testified that he next saw Howard about 15 minutes after Garrett left the *702 police station and set up surveillance on Chesnut Street. The officer stated he had a pair of high-powered binoculars and he saw Howard come out of a trail at Chesnut and Cherry Street. Garrett testified that he observed Howard unsuccessfully try to make contact with another subject before going back to the trail. Garrett received a phone call from Weaver who told him that the person Howard expected to see, Ervin Washington, |7was not at home and Howard was going to go to the home of Frank Washington to attempt a purchase of crack.
Garrett next saw Howard coming back on the trail onto the corner of Chesnut and Cherry Streets where he made contact with the defendant at his home. Garrett stated he could not hear the conversation between Howard and Washington, but saw them talking. He then saw Washington turn and walk to the left, around and behind a house. That was the last time Garrett was able to see Washington. Garrett testified that Howard stayed near the road while Washington went behind the house. Howard spoke to someone else for a minute, and then he went behind the house in the same direction as Washington. The officer stated Howard only stayed behind the house only a minute and then returned to the front of the house. Howard then left the area by way of the trail on which he had come.
Howard testified consistently with the officers regarding his preparation for the buy. Howard explained that prior to his encounter with the defendant, he stopped to talk to another drug dealer he happened to meet on the street. He stated he stopped another time when he saw his mother and sister and hid behind a dumpster until they went by. Howard testified he stopped at Ervin Washington’s house because he owed him money, a statement that did not align with the officers’ testimony. However, Howard confirmed that Ervin was not home. Thereafter, Howard called Weaver who instructed him to go to the defendant’s house. When he arrived, Washington was outside leaning against a car.
| sHoward testified he told Washington there was a man from Gibsland who wanted $100 worth, and Frank told him to get the money. When Howard told Washington he had the money, Washington asked, “Are you ready?” Howard told Washington, “It’s on.” Howard testified that Washington, “went through the trail to go through the back of the empty house across the road where he kept it and he come out of the trail and said okay.” Howard testified that the word “okay” meant “that he got a little shelf sitting behind the tree and he had put it on the shelf, that mean[t] for me to go around and get it and put the money on the shelf.” Howard also stated that he went to the shelf letting the camera film himself counting out the money, delivering the money on the shelf, and taking the five rocks of cocaine.
Howard stated that after he placed the money on the shelf and picked up the drugs, he told Washington he was coming back to pay his brother the money he owed him. Howard told Washington that he should have thrown in something extra, and Washington replied that he did. Howard testified that he took the five rocks of cocaine and carried them in his hand for a while before putting them in his shirt pocket. He stated he walked away from Washington’s house and communicated with the officers over the audio feed the entire time. Howard testified that he went back behind the newspaper building where the officers picked him up. He gave the officers the drugs when he got in their car, and when he got to the station they took the wires off and put his own *703 shirt back on. At that time, the officers paid him $100. Howard testified that he had no doubt in his mind that he 19purchased five rocks of cocaine from Washington. Howard also identified photographs of his actions with Washington produced from still photos taken from the video.
On cross-examination, Howard admitted that he did not see Washington place the drugs on the shelf. He testified that he knew that Washington placed the cocaine on the shelf, because he was the only person who “went back there.” He also testified that nobody came up behind him and gave him drugs. He testified that the only people he talked to were the other dealer and the dealer’s girlfriend, and one man in the yard with Frank Washington.
Weaver was qualified as an expert in identification of street drugs and also testified as a fact witness. He testified that initially he had attempted to get Howard to purchase drugs from Ervin Washington, the original target of the operation. When that transaction did not take place, Weaver told Howard via the direct audio communication to go to the home of Frank Washington and attempt to make a buy from him.
Weaver testified that the conversations from the video and those which he heard from the live audio equipment were consistent. He also stated that based upon his training as an expert witness, the conversation he heard between Washington and Howard indicated to him that Howard asked Washington for $100 worth of crack cocaine.
Weaver also testified that he was familiar with defendant’s house. He saw that portion of the video where Howard placed the money and obtained the five rocks of crack cocaine. Weaver testified that at the time of the | ^transaction, he saw Washington move “beside the house” and go “back to where the Cl later went back and laid the money and also received the cocaine.” Finally, from still photographs taken from the video, Weaver was able to identify Washington in the first and second photographs and Howard’s money and the five rocks of crack cocaine in the third and fourth photographs.
Weaver identified the five rocks of crack cocaine he received from Howard which were at that time in a deteriorated, crumbled state. Weaver stated he had written on the evidence tag that it was five rocks of suspected crack cocaine. He also indicated the person who it was purchased from, the date, and that he had turned it over to the evidence person at the Minden Police Department whose job it was to send it to the crime lab for analysis.
Weaver was asked about Howard’s recording device, and he acknowledged that the battery was low on the device. He explained that was why it quit working when Howard was approximately 1,000 yards from the point where he made contact with Weaver after the purchase and why there was no video of the informant turning the drugs over to him.
Garrett’s testimony also confirmed the events that transpired in the time period after the tape was stopped. He testified that upon leaving the defendant’s house, Howard walked back through the apartment complex where he lives, without stopping at his own apartment, and then he met the officers at the pre-arranged meeting place. Weaver took possession of the five rocks of cocaine that Howard handed him. According to regular police | n procedure, Howard was searched for any other illegal drugs or money, and he did not have any.
The 50-minute video introduced by the State into evidence generally corroborated *704 the preceding testimony in the following particulars:
• The informant’s preparation by the officers for the transaction.
• Howard’s stopping behind a dumpster and speaking to a man and woman (with a child) in a vehicle. Howard never approached the vehicle or made physical contact with either occupant of the car.
• Howard’s attempt to reach Ervin Washington by knocking on the door of his trailer. The video depicts a lady answering the door and informing Howard that Ervin was at work.
• Howard’s entrance into the Elderly Apartment complex where he entered two apartments including his own. In the first apartment he engages in an unintelligible conversation with an unknown male. In the second, he lights a cigarette and leaves.
• Howard’s encounter with Washington in the yard of the defendant’s home. Howard can be heard to mention $100 to Washington who disappeared from the video after making a comment to one of the men in the yard.[3] When someone is heard to say “all right,” Howard walked to a location near the house where he lifted a black tarp and placed the money under it. He then is seen to take several rocks of crack from behind the tarp.
• As Howard moved away from the black tarp, he can be heard to twice say “you ain’t give me nothing.” Somebody responded, “yeah I did,” to which Howard responded that he had to pay the 15 to Ervin.
• Howard returned to his apartment. For a moment, the video blacks out. Howard apparently drank something and announced his intent to leave. Howard exited the apartment building and walked approximately four minutes when the recording stopped before he reached the officers.
[ ^Officer Ronald Peyton, who supervised the evidence room at the Minden Police Department, explained how the evidence was sealed and that he received it from Weaver on the morning of June 3, 2010. He testified that after he sealed the evidence, he initialed the seals and transported the evidence to the crime lab on June 4, 2010. He also picked up the evidence from the crime lab on September 10, 2010, when he took it back to the evidence locker where it stayed until trial.
Randall Robillard, an expert in forensic chemistry from the North Louisiana Crime Lab in Shreveport, testified that he personally received the drugs at issue on June 7, 2010; the drugs had been delivered to the lab three days earlier. He testified that he performed routine standard tests on the material and determined that it contained cocaine. He prepared the report that was admitted as State’s Exhibit D which states, “Item 1 was determined to contain cocaine, Schedule II.”
When viewed in the light most favorable to the state, we find the evidence presented in support of Washington’s conviction to be sufficient to establish the elements of the charged offense beyond a reasonable doubt. The testimony of the officers, Howard and the video recording submitted into evidence established that Howard, an established confidential informant, went to Washington’s home in an attempt to buy drugs. Washington and Howard engaged in a conversation in which Howard indicated to Washington he wanted to buy $100 worth of crack cocaine. Weaver heard this conversation in real time and testified that in his expert 1^opinion, the words shared *705 between the two men corroborated Howard’s testimony. The video also establishes that the conversation took place.
Washington claims that the video never depicts him coming back to Howard after he went across the street to an empty house. Nevertheless, the jury obviously believed Howard’s eyewitness account which supplemented any deficiencies in the video. Upon Washington’s return, Howard reported that Washington spoke to him telling him it was “all right” to proceed. The evidence then indicates that Howard walked in the same direction from which Washington had come, immediately placed the $100 given to him by the police on the shelf under a black tarp, and took five rocks of cocaine from the shelf. The recording of the incident corroborates this portion of the informant’s testimony. The very short timing for the entirety of the encounter between the two men as documented by the video shows beyond a reasonable doubt that the defendant had facilitated the transaction.
Moreover, the jury also chose to believe the testimony of the crime lab witness who performed the analysis of the evidence presented to him and who determined that the substance was in fact cocaine. Full cross-examination of the witness was allowed by the defense concerning the technique or science used to make the identification of the substance. No objection to or contrary evidence was presented by the defense on the issue. The jury was entitled to weigh the evidence and make credibility determinations regarding its reliability.
From this evidence as well as Howard’s testimony, the conversations and actions of the parties established by the video and eyewitness accounts 114of the officer, the jury could have reasonably concluded to the exclusion of every other reasonable hypothesis of innocence (including any claim that the buy was a set-up by Howard to frame Washington) that it was Washington who knowingly placed cocaine on the shelf which Howard retrieved and paid for. This evidence is sufficient to prove the crime of distribution of cocaine.[4]
II.
Washington next argues that the imposed sentence is disproportionate to the crime under the facts and circumstances of this case. He contends that because of his age, the 20-year sentence may very well span the remainder of his productive work life and effectively transform him from a contributing member of society into a burden on the taxpayers.
The test imposed by the reviewing court in determining the exees-siveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,855 (La.App.2d Cir.2/28/07), 953 So.2d 890, writ denied, 07-0805 (La.3/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence is the goal of La. C. Gr. P. art. 894.1, not *706 rigid or mechanical compliance with its provisions. Where the record clearly shows |ir,an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Hampton, 38,017 (La.App.2d Cir.1/28/04), 865 So.2d 284, writs denied, 04-0834 (La.3/11/05), 896 So.2d 57, 04-2380 (La.6/3/05), 903 So.2d 452. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Haley, 38,258 (La.App.2d Cir.04/22/04), 873 So.2d 747, writ denied, 04-2606 (La.06/24/05), 904 So.2d 728.
There is no requirement that specific matters be given any particular weight at sentencing. State v. Shumaker, 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277, writ denied, 07-0144 (La.9/28/07), 964 So.2d 351; State v. Jones, 33,111 (La. App.2d Cir.3/1/00), 754 So.2d 392, writ denied, 00-1467 (La.2/2/01), 783 So.2d 385.
Second, a sentence violates La. Const, art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 01-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 01-0467 (La.1/15/02), 805 So.2d 166; State v. Lobato, |1 603 So.2d 739 (La.1992); State v. Robinson, 40,983 (La.App.2d Cir.1/24/07), 948 So.2d 379.
On the day of sentencing, the trial court noted its consideration of the facts presented in a presentence investigation report (“PSI”), including that Washington has a son who is going blind and a daughter in high school. He is 47 years old with an eleventh-grade education. The court considered that Washington worked throughout his life in construction and other manual labor endeavors. Nevertheless, the court noted that this offense was Washington’s third-felony conviction. The court considered that Washington’s first conviction in 1981 was for simple burglary for which he received probation which was terminated unsatisfactorily. The defendant did not commit any other crimes until 1990 when he was found guilty of three counts of distribution of Schedule II drugs. For the convictions, Washington served approximately nine years in prison and was paroled, but the parole was revoked in May of 2000. He was paroled again in April of 2004 and his parole expired in 2008.
After reviewing these facts the trial judge imposed the 20-year sentence, with the first two years to be served without benefit of probation, parole, or suspension of sentence. The court also accepted the forfeiture of a 1983 Chevrolet pickup truck in lieu of the court finding any costs were due.
We find adequate 894.1 compliance. The trial judge considered the facts presented to him in the PSI and took into consideration both mitigating and aggravating facts when he fashioned the defendant’s sentence, noting | l7social history, work experience, church affiliation, and family. The judge specifically considered the 894.1 guidelines and the fact that Washington’s criminal history occurred quite a while ago.
Moreover, we find this midrange sentence to be clearly tailored to fit the defen *707 dant and offense and not grossly disproportionate to the severity of the offense nor shocking to the sense of justice. For the conviction, Washington faced maximum sentencing exposure of 30 years. The offense of conviction is Washington’s third felony offense. He has previously served jail time for this identical offense and had been paroled only a few years prior to this offense. In these circumstances it is clear that Washington has failed to be rehabilitated by prior incarceration and leniency in sentencing. We see no constitutional error in the imposed sentence and reject Washington’s claim.
For the foregoing reasons, Washington’s conviction and sentence are affirmed.
AFFIRMED.

. Two of the charges concerned sales made on other dates and were reset for trial at a later date.

. Testimony and video indicate that Ervin’s trailer was next door to, or nearby, Washington's house.

. The audio portion of the video is difficult to understand. Howard turned away from Washington and did not have the camera pointed in the direction the defendant walked.

. Washington’s remaining claims in his pro se brief are without merit. The denial of his claims for new trial relating to chain of custody involved issues of fact and credibility which are not reviewable on appeal. La. C.Cr.P. art. 858. His claim that the trial court erred in failing to admonish the jury regarding alleged prejudicial remarks of a witness were waived at trial as no request for admonition was made to the court. State v. Williams, 383 So.2d 996 (La.1979).