PITMAN, J.
A unanimous jury found Defendant Robert Earl Bass, Jr., guilty as charged of second degree murder. The trial court sentenced him to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. He now appeals. For the following reasons, we affirm Defendant's conviction and sentence.
FACTS
On December 10, 2015, a grand jury indicted Defendant on one count of second degree murder in violation of La. R.S. 14:30.1. The bill of indictment alleged that between the dates of November 11-15, 2015, he committed the murder of Brandon Albritton. On January 5, 2016, Defendant pled not guilty.
A jury trial began on January 17, 2017. Detective Chris Fulmer of the Monroe Police *642 Department testified that at 9:40 p.m. on November 11, 2015, the police department received a call about a murder. During the investigation that followed, law enforcement went to 205½ Filhiol Avenue, a garage apartment located behind 205 Filhiol Avenue, and learned that Ronald Redfearn and Allison Rogers lived in the apartment. Det. Fulmer stated that a .380 caliber shell casing was found in the alley behind 205½ Filhiol Avenue and noted that no weapon or bullet was found.
Grant Cookston testified that the weekend before the shooting, he and Albritton went to Filhiol Avenue so Albritton could purchase drugs. At approximately 9:00 p.m. on November 11, 2015, he picked up Albritton and they returned to the alley behind Filhiol Avenue so that they could purchase drugs again. He gave Albritton $20 to purchase methamphetamine and remained in the car while Albritton exited and walked past the left side of the car. Approximately five minutes later, a black man walked up from the left side of the car and asked him for a ride. He told the man he could not give him a ride. The man then walked around the car and stopped and stood by the passenger side. Approximately two minutes later, Albritton returned and spoke with the man, who asked Albritton if they could give him a ride. Albritton turned away from the man, and the man drew out a gun and shot Albritton, who fell into the passenger seat. Mr. Cookston observed that Albritton was bleeding, and he started his car, put it in reverse and drove away. He noted that Albritton's body was only partially inside the car and that his feet were dragging on the ground. He drove to a nearby donut shop and called 911. He testified that he had difficulty identifying the shooter in the photographic lineup presented by the police. He was conflicted between the men in the first and fifth photographs because he was trying to determine which man's hairstyle was more consistent with that of the shooter.
Ronald "Joey" Redfearn testified that he had lived in the apartment at 205½ Filhiol Avenue for several months at the time of the shooting. He grew up with Albritton, and Albritton would come to the apartment to exchange clothing for methamphetamine. He stated that he had known Defendant for approximately two years and that Defendant frequently visited him. He testified that Defendant and Albritton met several days before the shooting, and Defendant later told him that he would have shot Albritton if he had had his gun. He noted that Defendant usually carried an automatic gun. He testified that on the night of the shooting, Defendant was at his apartment when Albritton arrived. Defendant went outside, and Albritton later left the apartment and walked toward the alley. He noted that Defendant was in the backyard at this time and followed Albritton. He recalled hearing a "pow" that sounded like a firecracker or gun followed by the sound of a car "taking off" and "burning rubber." He then saw Defendant walking back through the yard from the direction of the alley. The next day he learned that Albritton had been shot.
Allison Roberts testified that Redfearn is her boyfriend and that they lived at 205½ Filhiol Avenue. She stated that she knew both Albritton and Defendant. She testified that several days before the shooting, Defendant shaped his hand like a pistol and stated that if he had a gun he would have shot Albritton and that he would "gut him up" the next time he saw him. She stated that on the evening of the shooting, she, Redfearn, Timothy Millien, Ashley Frith and Defendant were at the apartment. She did not see any other black men at the apartment that night. She was not under the influence of drugs or alcohol because she was pregnant. Albritton *643 walked into the apartment and greeted everyone, including Defendant, who then walked outside. Albritton stayed for 10 or 15 minutes or less and then left the apartment and walked toward the alley. Approximately three minutes later, she was standing outside and heard from the direction of the alley a "pop," which sounded like a firecracker or a small hand pistol, followed by the sound of car wheels spinning. She then saw Defendant walking in "kind of fast pacing" from the direction of the alley. He asked her for the keys to Redfearn's truck, but she said no. He then asked her to let him go inside, but she said no because she wanted everyone to leave. She observed Defendant walk away from the apartment, noting that Defendant was wearing a Raiders flat bill hat. She further testified that Defendant owned a gun. She recalled that Ashley Frith told her that she saw Defendant with a gun on the night of the shooting.
Ashley Frith testified that she was at the apartment on the night of the shooting. She admitted that she was under the influence of Suboxone, Xanax and methamphetamine, so she did not remember everything that happened that evening. She recalled seeing a black man at the apartment and noted that she did not see him with a gun. She stated that she did not know Albritton and did not see him that evening. She heard a loud "pop" when she was standing outside and thought it was fireworks. She did not recall telling Roberts that she saw a black man with a gun that night, but noted that her failure to remember might be due to the drugs she had taken.
Timothy Millien testified that he knows Redfearn and visited him many times at his apartment; has known Defendant for several years; and met Albritton a few times. He stated that on the evening of the shooting, he was at Redfearn's apartment and was under the influence of methamphetamine. He observed Defendant leave the apartment as Albritton arrived. He noted that Defendant was the only black male present at the apartment that evening. When he walked outside, he did not see Defendant. He heard a "pop" followed by "squealing" tires. He later observed Defendant asking someone for a ride.
Lieutenant Jeremy Kent testified that on November 11, 2015, he was working as a detective with the Monroe Police Department and responded to a shooting at a donut shop. When he arrived at the donut shop, he met Cookston. Albritton had already been transported to the hospital. Some of Albritton's clothing remained in the parking lot, and the pockets of his clothing contained his wallet, some cologne, a Sharpie, a loose $20 bill and a pocketknife. He noted that the weather was stormy with rain and wind, which prevented him from processing Cookston's car, so he had the car towed to the police department. He and Cookston then attempted to locate the scene of the crime. On November 16, 2015, he showed a photographic lineup to Cookston. He noted that Cookston had a difficult time identifying a suspect and "went back and forth" between the men in the first and fifth photographs, eventually choosing the man in the fifth photograph. This man was later determined to be incarcerated at the time of the shooting. Defendant was featured in the first photograph. Lt. Kent stated in his report that Cookston had difficulty selecting a photograph because of the different hairstyles of the men in the photographs. He further testified that on November 16, 2015, Sgt. Samehea Turner of the Ouachita Parish Sheriff's Office contacted him, and he took her recorded statement regarding a conversation she had had with Defendant. Defendant was developed as a suspect and later arrested. He also testified that no bullet or gun was found at the *644 scene of the shooting and that no evidence was recovered after a search of Defendant's residence.
Sgt. Samehea Turner testified that she has known Defendant and his family for 20 years, that their families attended church together and that she considered him a friend. She testified that on the morning of the day she contacted Lt. Kent, Defendant walked up to her vehicle while she was in the drive-through line at a donut shop and asked what she knew about the homicide that occurred on Filhiol Avenue. She was unaware of the shooting at that time and told Defendant so. Defendant asked her to look up the offense up on her phone, but she was bothered by his questions and changed the subject of their conversation. Defendant again told her to look up the offense on her phone and then said to her "that's not how it happened, they tried to rob me." She noted that Defendant was referring to the incident on Filhiol Avenue. Defendant asked her to keep their conversation between her, him and God. When she later learned that there had been a homicide on Filhiol Avenue, she contacted the Monroe Police Department.
Dr. Frank Peretti, accepted as an expert in the field of forensic pathology, testified that he performed the autopsy on Albritton. He stated that Albritton's cause of death was a gunshot to the head. He noted that the gun was fired from a distance of two or more feet away from Albritton and that the bullet entered the right temple above the ear and exited on the left temple. He stated that Albritton was shot on November 11, 2015, but was kept on life support and not declared dead until November 15, 2015, so that his organs could be harvested and donated.
During the trial, Juror No. 21, Dr. Cynthia Brown-Manning, advised the bailiff that after seeing Frith and Millien and hearing their testimony, she recognized, and confirmed, them as incarcerated persons she saw and was involved with during an intake process as part of her contract work with the Ouachita Correctional Center. She stated that her interaction with them would have been a five-minute examination in which she listened to their hearts and lungs. She also stated that there was no discussion of this case and that she could remain fair and impartial in these proceedings. The state objected to her remaining on the jury on grounds that the confidential interactions of this juror with these two witnesses might influence her assessment of their credibility during deliberations. The defense had no objection to her remaining on the jury. The trial court noted that due to her interaction with the two witnesses, she had additional information about them that the remainder of the jury would not be privy to and that she obtained this information through the physician-patient relationship, which could unfairly influence her ability to deliberate the case. Accordingly, the trial court sustained the state's challenge for cause and excused her from the jury.
After the state rested, the defense moved for a directed verdict on the grounds that the evidence presented by the state was insufficient for a guilty verdict. The trial court found that the motion was without merit and denied it.[1] The defense rested. On January 19, 2017, a unanimous jury found Defendant guilty as charged of second degree murder.
On May 10, 2017, Defendant filed a motion to reconsider sentence, a motion for appeal, a motion for new trial and a motion for post-verdict judgment of acquittal. The trial court denied these motions as premature.
*645 A sentencing hearing was held on May 23, 2017. The trial court sentenced Defendant to the mandatory sentence of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.
On May 30, 2017, Defendant filed a motion for new trial, a motion for appeal, a motion for post-verdict judgment of acquittal and a motion to reconsider sentence.
On June 1, 2017, the trial court vacated and set aside Defendant's sentence because his motions for new trial and post-verdict judgment of acquittal were pending.
On June 26, 2017, a hearing was held on Defendant's post-trial motions. The trial court denied Defendant's motion for post-verdict judgment of acquittal and motion for new trial. The defense waived sentencing delays, and the trial court proceeded with resentencing Defendant. It reviewed Defendant's postsentence investigation report, detailing his criminal, social educational and work history and the factual basis for the conviction and sentence. It found no mitigating circumstances and noted that Defendant had shown no apparent remorse. It then sentenced Defendant to the mandatory sentence of life imprisonment at hard labor, without benefit of probation, parole or suspension of sentence.
On June 28, 2017, Defendant filed a motion to reconsider sentence, claiming that his sentence was excessive. The trial court denied the motion on July 6, 2017.
Defendant appeals.
DISCUSSION
Insufficient Evidence
In his first assignment of error, Defendant argues that the evidence presented at trial was insufficient for any rational trier of fact to have found him guilty. He contends that there were no eyewitnesses or physical evidence linking him to the shooting, that no witnesses placed him at the scene at the time of the murder and that another individual was identified in a photographic lineup as the shooter. He states that he was in the yard at the time of the shooting. He also contends that Sgt. Turner misinterpreted his statements to her when he was inquiring about the homicide on Filhiol Avenue.
The state asserts that the evidence presented at trial was sufficient to support Defendant's conviction of second degree murder. Regarding Cookston's difficulty choosing the shooter from a photographic lineup due to the hairstyles of the men in the photographs, the state notes that Defendant was bald at the time of his arrest, and all of the men in the photographs had hair. It points out that Roberts testified that Defendant was wearing a baseball cap on the evening of the shooting. It emphasizes that Defendant was seen coming from the alley at a fast pace shortly after the shot was fired; that he was known to carry a gun and was seen with a gun on the evening of the shooting; and that several days before the shooting, he said he would have shot Albritton if he had had a gun. The state contends that Defendant admitted his involvement in the shooting by telling Sgt. Turner that "they tried to rob me."
The standard of review for a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1979) ; State v. Hearold , 603 So.2d 731 (La. 1992) ; State v. Smith , 47,983 (La. App. 2 Cir. 5/15/13), 116 So.3d 884. See also La. C. Cr. P. art. 821. This standard does not provide an *646 appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. State v. Pigford , 05-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Robertson , 96-1048 (La. 10/4/96), 680 So.2d 1165.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. State v. Allen , 36,180 (La. App. 2 Cir. 9/18/02), 828 So.2d 622, writs denied , 02-2595 (La. 3/28/03), 840 So.2d 566, and 02-2997 (La. 6/27/03), 847 So.2d 1255, and cert. denied , 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed. 2d 90 (2004). An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in a light most favorable to the prosecution. Id. When the direct evidence is thus viewed, the facts established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Id. , citing State v. Sutton , 436 So.2d 471 (La. 1983), and State v. Owens , 30,903 (La. App. 2 Cir. 9/25/98), 719 So.2d 610, writ denied , 98-2723 (La. 2/5/99), 737 So.2d 747.
Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Broome , 49,004 (La. App. 2 Cir. 4/9/14), 136 So.3d 979, writ denied , 14-0990 (La. 1/16/15), 157 So.3d 1127, citing State v. Moore , 44,429 (La. App. 2 Cir. 8/26/09), 20 So.3d 1137. If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438 ; State v. Broome , supra .
The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. State v. Casey , 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed. 2d 62 (2000). A reviewing court may not impinge on the fact finder's discretion unless it is necessary to guarantee the fundamental due process of law. Id. The appellate court does not assess credibility or reweigh the evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam , 36,118 (La. App. 2 Cir. 8/30/02), 827 So.2d 508.
La. R.S. 14:30.1 provides, in pertinent part, that second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent need not be proven as a fact, but it may be inferred from the circumstances of the offense and the defendant's actions. State v. Graham , 420 So.2d 1126 (La. 1982) ; State v. Allen , 41,548 (La. App. 2 Cir. 11/15/06), 942 So.2d 1244. Specific intent to kill or inflict great bodily harm, as required to convict for second degree murder, may be inferred from the extent and severity of the victim's injuries. State v. Thornton , 47,598 (La. App. 2 Cir. 3/13/13), 111 So.3d 1130. Specific intent may be inferred when a wound is inflicted at close range, such as shooting someone in the head. State v. Christopher , 50,943 (La. App. 2 Cir. 11/16/16), 209 So.3d 255, writ denied , 16-2187 (La. 9/6/17), 224 So.3d 985. Specific intent to kill may be inferred from a defendant's act of deliberately pointing a gun and firing it at a person. State v. Freeman , 45,127 (La. App. 2 Cir. 4/14/10), 34 So.3d 541, writ denied , *647 10-1043 (La. 11/24/10), 50 So.3d 827. The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Allen , 828 So.2d 622, supra .
When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. State v. Robinson , 50,643 (La. App. 2 Cir. 6/22/16), 197 So.3d 717, writ denied , 16-1479 (La. 5/19/17), 221 So.3d 78. Positive identification by only one witness is sufficient to support a conviction. Id.
The testimonial evidence presented at trial shows that Defendant killed Albritton while having the requisite specific intent to kill or inflict great bodily harm. Several witnesses placed Defendant at the scene at the time of the shooting. Redfearn testified that when Albritton left the apartment and walked toward the alley, Defendant was in the yard and followed him. He then heard a "pow" and observed Defendant walking back through the yard from the direction of the alley. Roberts testified that Defendant was outside when Albritton left the apartment and walked toward the alley. She stated that approximately three minutes after Albritton left, she heard a "pop" and then observed Defendant walking from the direction of the alley. Further, when speaking with Sgt. Turner, Defendant placed himself at the scene and implicated himself in the shooting by asking about the homicide that occurred on Filhiol Avenue and stating "that's not how it happened, they tried to rob me."
Although Cookston had difficulty identifying the shooter from a photographic lineup and ultimately did not choose a photograph of Defendant, he testified that the shooter was a black male who walked into the alley and asked him for a ride. Roberts testified that she did not see any other black men at the apartment that evening besides Defendant. She noted that Defendant asked her for the keys to Redfearn's truck. Millien testified that Defendant was the only black man present that evening and that he observed Defendant asking someone for a ride.
Redfearn and Roberts both testified that Defendant owned a gun. Roberts stated that Frith told her that she saw Defendant with a gun on the evening of the shooting. Frith testified that she did not remember telling this to Roberts, but she admitted that she was under the influence of Suboxone, Xanax and methamphetamine at the time, which could have affected her memory.
By shooting Albritton in the head at close range, Defendant committed an act for which specific intent may be inferred. Further, Redfearn and Roberts both testified that several days before the shooting, Defendant commented that he would have shot Albritton if he had had his gun.
Considering the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the state proved beyond a reasonable doubt that Defendant killed Albritton by shooting him in the head and had the specific intent to kill or inflict great bodily harm.
Accordingly, this assignment of error lacks merit.
Dismissal of Juror
In his second assignment of error, Defendant argues that the trial court impermissibly excused juror Dr. Brown-Manning without cause after the trial had commenced. He contends that the state did not present evidence that the witnesses, i.e., Frith and Millien, were booked into prison while she was working there. He states that she never said that she knew either witness, but that she *648 could have possibly interacted with them. He also argues that she maintained that she could remain fair and impartial. He further contends that the state never stated that it would have challenged her as a juror during voir dire had it known the information that was later revealed.
The state argues that the trial court did not abuse its discretion in dismissing Dr. Brown-Manning as a juror. It notes that during voir dire, she never disclosed that she was a contract physician with the Ouachita Correctional Center or that two witnesses had been her patients. It asserts that had this information been disclosed during voir dire, it would have exercised a peremptory challenge due to the juror's connection to these two witnesses. It notes that the physician-patient privilege precluded sufficient questioning of the juror to determine her knowledge of Frith and Millien.
Alternate jurors, in the order in which they are called, shall replace jurors who become unable to perform or disqualified from performing their duties. La. C. Cr. P. art. 789(A). The trial court has the discretion to decide whether a juror has become disqualified to perform his or her duties and, if so, what action to take. State v. Fuller , 454 So.2d 119 (La. 1984).
The trial court did not abuse its discretion in dismissing Dr. Brown-Manning as a juror. She examined Frith and Millien as patients during an intake process as part of her contract work with Ouachita Correctional Center. Although she stated that they did not discuss the case sub judice and that she could remain fair and impartial, physician-patient privilege prevented the parties and the court from sufficiently questioning her as to what information she might have learned about Frith and Millien and how that information might impact her assessment of their credibility in this case, which is a significant part of the fact finder's role in reaching a verdict.
Accordingly, this assignment of error lacks merit.
CONCLUSION
For the foregoing reasons, we affirm the conviction and sentence of Defendant Robert Earl Bass, Jr.
AFFIRMED.

See State v. Davenport , 13-1859 (La. 5/7/14), 147 So.3d 137.