Judgment rendered August 14, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 992,
La. C. Cr. P.

No. 52,640-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

SIRDETRICK SAMUELS                          Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 344844

Honorable John D. Mosely, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Holli A. Herrle-Castillo


JAMES E. STEWART, SR.                  Counsel for Appellee
District Attorney


WILLIAM J. EDWARDS
BRITNEY A. GREEN
CHARLES K. PARR
Assistant District Attorneys

* * * * *

Before WILLIAMS, MOORE, and McCALLUM, JJ.

**WILLIAMS, C.J**.

The defendant, Sirdetrick Samuels, was charged by bill of indictment with second degree murder, in violation of La. R.S. 14:30.1. Following a jury trial, he was found guilty of the responsive verdict of manslaughter, La. R.S. 14:31. The defendant was adjudicated a third-felony offender and was sentenced to 50 years' imprisonment at hard labor without the benefit of probation or suspension of sentence. For the following reasons, we affirm.

## FACTS

On November 8, 2016, at approximately 11:00 p.m., 16-year-old Tremon Jackson was shot multiple times while standing outside his grandmother's house located on Boss Street in Shreveport, Louisiana. Tremon's uncle, 20-year-old Quincy Jackson, and a friend, Kenlya Patrick Alford, were witnesses to the incident, and they identified the defendant, Sirdetrick Samuels, as the shooter. The defendant was arrested and charged by bill of indictment with the second degree murder of Tremon.

During the defendant's trial, Quincy Jackson testified as follows: he and Alford were standing near the driveway of the residence when the defendant walked up and asked, "What's up?"; when Tremon exited the residence, the defendant asked him, "What's up?"; Tremon did not respond; the defendant then asked Tremon if they "were good," and Tremon ignored the inquiry; he (Quincy) turned his back and heard gunshots; he and Alford ran into the garage to avoid the bullets; he looked out and saw the defendant firing a black gun; he did not see the bullets strike Tremon, but he saw Tremon run in the direction of "the gate"; he was unsure how many shots were fired; he saw the defendant flee in the same direction from which he had arrived; he went inside the house to see if Tremon had run inside; he and

Alford found Tremon lying in the yard, bleeding from several gunshot wounds; Timothy Stewart, his sister's boyfriend, was down the street when he heard gunshots; when Stewart drove up to the house, he and others placed Tremon inside Stewart's vehicle to drive Tremon to the hospital; Stewart's vehicle "broke down" before they reached the hospital; he called 911 from the car; EMS arrived and transported Tremon to the hospital, where he was pronounced dead on arrival; when he was initially questioned by police officers, he refused to provide them with the name of the shooter;[1] he identified the defendant as the shooter after he was transported to the police station; and neither he nor Tremon had been smoking marijuana on the night of the shooting.

Kenlya Patrick Alford testified as follows: on the night of the incident, he and Quincy were standing outside Quincy's house when the defendant approached them and spoke to them; when Tremon walked outside, the defendant asked him if they "were good"; Tremon did not reply; the defendant reached in a downward direction and came up with a gun; he "ducked" when he heard gunshots; he ran into the garage to hide beside a parked car; he knew it was safe to come out and look for Tremon when he saw the defendant flee the scene; he and Quincy found Tremon on the side of the house near the front yard; Stewart arrived and attempted to drive Tremon to the hospital; and Stewart's car "broke down" on Texas Street.

Kenneth Joshua testified as follows: he was the boyfriend of Lisa Jackson, who is the mother of Quincy and the grandmother of Tremon; he was in the bathroom of the residence when he heard gunshots; he ran to the

_____

[1] Quincy was questioned by the police officers on Texas Street, the location from which the victim was picked up by EMS.

2

back door of the house; when he reached the door, Quincy and Alford were entering the house, asking if he knew the whereabouts of Tremon; he, Quincy and Alford ran outside and found Tremon in the front yard; Quincy and Alford initially told him that "somebody" walked up to them, asked for a cigar, and began shooting; Alford was "acting strange" and was exhibiting an "unusual" response to the shooting; and he did not see the defendant in front of the house that night.

Timothy Stewart testified as follows: his mother lived down the street from the scene of the shooting; he was leaving his mother's house when he heard gunshots; he drove to the Jacksons' house and saw that Tremon had been shot and was not breathing; he rushed to drive Tremon to LSU Medical Center; he bypassed Willis-Knighton Hospital because it did not "handle" gunshot wounds; his car "broke down" on Texas Street; Quincy called 911 and the paramedics transported Tremon to the hospital; and Quincy and Alford told him that "Detrick" shot Tremon.

Corporal John Madjerick, a crime scene investigator with the Shreveport Police Department ("SPD"), testified as follows: when he arrived at the hospital, he was informed that Tremon was deceased; he collected the plaid shorts that Tremon had been wearing at the time of the shooting; he also collected a small "baggy" of suspected marijuana that the medical staff had found in Tremon's sock; he processed the scene of the shooting and took photographs; and he collected five expended 9 millimeter casings from the scene and a projectile that was found under the vehicle parked in the garage.

Agent William Moak, of the SPD, testified that he interviewed Alford on the night of the shooting. According to Agent Moak, Alford initially

3

denied having any knowledge of the incident. He also testified that Alford denied knowing the identity of the shooter, and claimed that the shooter "came out of nowhere" wearing a black hoodie. The agent further testified that Alford eventually identified the defendant as the shooter.

Detective Logan McDonald testified that he interviewed Quincy and Alford. He stated that he showed both men a "confirmation photograph" of the defendant, and they both positively identified the defendant as the person who shot Tremon. Det. McDonald also testified that he obtained a warrant for the defendant's arrest. He stated that three days after the warrant was issued, the defendant turned himself in accompanied by his attorney.

Two witnesses testified for the defense. Lamaria Cooper testified that she was with Stewart the night Tremon was shot. She stated that she heard gunshots but did not see the person who was shooting. According to Cooper, she saw Alford running down the street, but she did not see the defendant.

Sandra Bryant, the defendant's great-aunt, testified that she learned that the defendant was wanted in connection with a murder from watching a "story on the news." She stated that she drove the defendant to the police station, where he met with an attorney and turned himself over to law enforcement officers.

Other evidence presented at the defendant's trial demonstrated that approximately one month prior to the shooting, the defendant committed a drive-by shooting from a stolen truck. Tremon had been one of the victims of that drive-by shooting. The police officers learned that the defendant was a passenger in the stolen vehicle and that he had been dropped off at the hospital after shooting himself in the hand while committing the drive-by

shooting. Blood evidence, which contained the defendant's DNA, was discovered in the backseat of the stolen vehicle.

At the conclusion of the trial, a jury found the defendant guilty of manslaughter, a responsive verdict to the charged offense of second degree murder. The trial court denied the defendant's motions for new trial and post-verdict judgment of acquittal. The defendant was adjudicated a third-felony offender and was sentenced to 50 years' imprisonment at hard labor without the benefit of probation or suspension of sentence.

The defendant now appeals.

## DISCUSSION

The defendant contends the trial court erred in excusing for cause one of the alternate jurors after the trial commenced. He argues that there was no evidence to demonstrate that the alternate juror was incompetent to serve. The defendant also argues that the trial court failed to provide the attorneys with the opportunity to question the excused alternate juror to explore the basis for the dismissal. According to the defendant, the proper remedy for the trial court's error is to set aside his conviction.

Once a jury has been selected and sworn, the accused has a right to have his fate decided by the particular jurors selected to try him. *State v. Cass*, 356 So.2d 396 (La. 1977); *State v. Traylor*, 51,901 (La. App. 2 Cir. 2/28/18), 246 So. 3d 665, 669, *writ denied*, 2018-0493 (La. 2/11/19), 263 So. 3d 893. If it is discovered after a juror has been accepted and sworn, that he is incompetent to serve, the court may, at any time before the first witness is sworn, order the juror removed and the panel completed in the ordinary course. La. C. Cr. P. art. 796.

5

The trial court has the discretion to decide whether a juror has become disqualified to perform his or her duties and, if so, what action to take. *State v. Fuller*, 454 So. 2d 119 (La. 1984); *State v. Bass*, 52,014 (La. App. 2 Cir. 5/23/18), 248 So. 3d 639, *writ denied*, 2018-0939 (La. 3/6/19), 266 So. 3d 896. Absent a clear showing of abuse of discretion, the trial court's ruling as to the qualifications of a juror to serve should not be disturbed on appeal. *State v. Letulier*, 1997-1360 (La. 7/8/98), 750 So. 2d 784.

With regard to alternate jurors, La. C. Cr. P. art. 789 provides, in pertinent part:

> A. The court may direct that not more than six jurors in addition to the regular panel be called and impaneled to sit as alternate jurors. Alternate jurors, in the order in which they are called, shall replace jurors who become unable to perform or disqualified from performing their duties. Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges for cause, shall take the same oath, and shall have the same functions, powers, facilities, and privileges as the principal jurors. If the court determines that alternate jurors are desirable in the case, the court shall determine the number to be chosen. The regular peremptory challenges allowed by law shall not be used against the alternate jurors. The court shall determine how many additional peremptory challenges shall be allowed, and each defendant shall have an equal number of such challenges. The state shall have as many peremptory challenges as the defense. The additional peremptory challenges may be used only against alternate jurors. Except in capital cases, an alternate juror who does not replace a principal juror may be discharged when the jury retires to consider its verdict.
>
> ***
>
> B. If the court, as provided in Paragraph A, replaces a principal juror with an alternate juror after deliberations have begun, the court shall order the jury to begin deliberations anew.

La. C. Cr. P. art. 797 provides, in part:

> The state or the defendant may challenge a juror for cause on the ground that:
>
> ***
>
> (3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict[.]
>
> ***

In the instant case, after the jury was empaneled and sworn, and two of the state's witnesses had testified, the assistant district attorney notified the trial court that Lisa Jackson (the victim's grandmother and a witness in this case) had approached her with regard to Jeffery Hunt, Alternate Juror No. 1.[2] The colloquy was as follows:

> ADA: Your Honor, there was an issue brought to my attention after the break, after the Court had recessed for lunch. Specifically, Ms. Lisa Jackson approached and advised me that she recognized one of the jurors, Mr. H[unt], and that she believed that he knew her as well. So I've divulged that information both to the Court as well as Defense Counsel.
>
> COURT: [S]imultaneously as your witnesses were – were revealing that information to you, the *** alternate juror revealed it to the bailiff, who revealed it to me, and I called him in and questioned him about it.
> And based on my conversation with him, I'm 100 percent sure that because he is close to the – to that family or – or knows that family, it is too close for him to serve as a juror on this matter after having a conversation with him, so I'm going to excuse him for cause.

The trial court then designated Alternate Juror No. 2 as Alternate Juror No. 1. Defense counsel objected to the trial court's ruling but did not state any grounds for the objection.

---

[2] The record reveals that the assistant district attorney mistakenly referred to Mr. Hunt as "Mr. Hinds."

After reviewing this record, we find that the trial court did not abuse its discretion in dismissing Mr. Hunt as an alternate juror. The trial court examined Mr. Hunt and found that his relationship with the victim's family rendered him incompetent to serve as an alternate juror in this case. Moreover, excusing Mr. Hunt, one of two alternate jurors, did not disturb the composition of the jury. Therefore, the defendant's right to have his fate decided by the particular jurors selected to try him was unaffected by the trial court's decision to excuse the alternate juror. This assignment is without merit.

The defendant also contends the trial court erred in granting the state's 404(B) motion and allowing it to introduce evidence of other crimes. He argues that the state failed to establish that he was actually involved in the prior drive-by shooting. The evidence presented showed that the defendant may have been in possession of the stolen truck, by virtue of the blood DNA evidence found in the truck. According to the defendant, only one witness implicated him in the drive-by shooting, and the credibility of that witness was "suspect." The defendant also argues that the probative value of the "other crimes" evidence was outweighed by the danger that the evidence would confuse the issues, mislead the jury and cause prejudice.

An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La. C. Cr. P. art. 841(A). In order to preserve an issue for appellate review, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for the objection. *State v. Boyette*, 52,411 (La. App. 2 Cir. 1/16/19), 264 So. 3d 625; *State v. Mosley*, 51,168 (La. App. 2 Cir. 6/21/17), 223 So. 3d 158.

8

In the instant case, on August 2, 2017, the state filed a "404(B) Notice," advising that it intended to use evidence of other crimes committed by the defendant. Specifically, the state alleged as follows:

> On or about October 12, 2016, the defendant, Sirdetrick Samuels, committed the offense of aggravated assault from a motor vehicle. This offense occurred on the 3000 block of Frederick Street, Shreveport, LA. The defendant fired several shots in the direction of Tremon Jackson and several other individuals sitting on the front porch of [a home located at] 3010 Frederick St., Shreveport, LA.
>
> ***
>
> The purpose of this other crimes evidence is for proof of motive, intent, knowledge and absence of mistake or accident.
>
> ***

On October 19, 2017, the trial court conducted a 404(B) hearing, during which three police officers testified with regard to a theft of a pickup truck that occurred on October 11, 2016, and a drive-by shooting, during which the stolen vehicle was used, that occurred on October 12, 2016. According to the testimony, Tremon Jackson, the victim in the instant case, was one of the victims of the drive-by shooting. Minutes after the drive-by shooting, the driver of the stolen vehicle crashed it into a house during a high-speed chase with police officers.[3] The defendant was developed as a suspect when one of the passengers in the stolen truck informed the investigating officers that the defendant had shot himself in the hand while "doing the drive-by shooting on Frederick." Subsequent DNA testing revealed that the blood in the backseat of the vehicle belonged to the defendant. At the conclusion of the hearing, the trial court concluded that

_____

[3] Prior to the high-speed chase, the defendant had been dropped off at the hospital by an unidentified person.

9

the evidence of other crimes was admissible. The defendant did not object to the ruling.

Additionally, during the defendant's trial, multiple witnesses testified at trial with regard to the stolen vehicle/drive-by shooting incidents. The defendant cross-examined the witnesses, but did not object to the testimony or to the admissibility of the evidence related to the prior incidents. Accordingly, the issue was not preserved for appellate review by a contemporaneous objection. *State v. Grant*, 41,745 (La. App. 2 Cir. 4/4/07), 954 So. 2d 823, *writ denied*, 2007-1193 (La. 12/7/07), 969 So. 2d 629; *State v. Taylor*, 37,356 (La. App. 2 Cir. 9/26/03), 855 So. 2d 958, *writ denied*, 2003-3141 (La. 3/19/04), 869 So. 2d 848. This assignment lacks merit.

The defendant also contends the trial court erred in failing to rule on his motion to reconsider sentence. According to the defendant, this matter should be remanded to afford the trial court the opportunity to reconsider his sentence.

In *State v. Jackson*, 46,963 (La. App. 2 Cir. 2/29/12), 87 So. 3d 174, this Court stated:

> [T]he absence of a ruling on the motion to reconsider sentence does not affect this court's ability to consider the constitutional excessiveness of the defendant's sentence on appeal nor does it require a remand, since the trial court retains jurisdiction to rule on the motion to reconsider sentence and the defendant is within her rights to provoke same. Should the trial court later rule upon defendant's motion to reconsider sentence, the defendant may seek appellate review of that decision pursuant to La. C. Cr. P. art. 914(B)(2). *State v. Lathan* [41,855 (La. App. 2 Cir. 2/28/07), 953 So. 2d 890, *writ denied*, 2007-0805 (La. 3/28/08), 978 So. 2d 297].

*Id*. at 181-82.

Our review of this record reveals that on July 23, 2018, the defendant filed a motion to reconsider sentence and a motion for appeal. On July 25, the trial court granted the motion for an appeal, but did not rule on the motion to reconsider sentence. In spite of the trial court's failure to rule on the motion to reconsider sentence, no provision within the Code of Criminal Procedure prohibits this Court from reviewing the defendant's sentence for constitutional excessiveness. Consequently, we will review the defendant's sentence to determine whether it is constitutionally excessive.

The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects that it adequately considered the guidelines of the article. *State v. Smith*, 433 So. 2d 688 (La. 1983); *State v. Watson*, 46,572 (La. App. 2 Cir. 9/21/11), 73 So. 3d 471. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. *State v. Lanclos*, 419 So. 2d 475 (La. 1982); *State v. Swayzer*, 43,350 (La. App. 2 Cir. 8/13/08), 989 So. 2d 267, *writ denied*, 2008-2697 (La. 9/18/09), 17 So. 3d 388. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, and employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. *State v. Jones*, 398 So. 2d 1049 (La. 1981); *State v. Ates*, 43,327 (La. App. 2 Cir. 8/13/08), 989 So. 2d 259,

11

*writ denied*, 2008-2341 (La. 5/15/09), 8 So. 3d 581. There is no requirement that specific matters be given any particular weight at sentencing. *State v. Taves*, 2003-0518 (La. 12/3/03), 861 So. 2d 144; *State v. Caldwell*, 46,718 (La. App. 2 Cir. 11/2/11), 78 So. 3d 799.

Second, the court must determine whether the sentence is constitutionally excessive. A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Smith*, 2001-2574 (La. 1/14/03), 839 So. 2d 1; *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Bonanno*, 384 So. 2d 355 (La. 1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 2001-0467 (La. 1/15/02), 805 So. 2d 166; *State v. Washington*, 46,568 (La. App. 2 Cir. 9/21/11), 73 So. 3d 440, *writ denied*, 2011-2305 (La. 4/27/12), 86 So. 3d 625. As a general rule, maximum or near maximum sentences are reserved for the worst offenders and the worst offenses. *State v. Williams*, 48,525 (La. App. 2 Cir. 11/20/13), 128 So. 3d 1250.

The trial judge is given wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed should not be set aside as excessive in the absence of a manifest abuse of his discretion. *State v. Williams*, 2003-3514 (La. 12/13/04), 893 So. 2d 7; *State v. Diaz*, 46,750 (La. App. 2 Cir. 12/14/11), 81 So. 3d 228. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Williams*, *supra*; *State v. Free*, 46,894 (La. App. 2 Cir. 1/25/12), 86 So. 3d 29.

12

Whoever commits manslaughter shall be imprisoned at hard labor for not more than 40 years. La. R.S. 14:31(B).  At the time the crime of conviction was committed, La. R.S. 15:529.1 provided, in pertinent part:

> A. Any person who, after having been convicted within this state of a felony, or who, after having been convicted under the laws of any other state or of the United States, or any foreign government of a crime which, if committed in this state would be a felony, thereafter commits any subsequent felony within this state, upon conviction of said felony, shall be punished as follows:
> \*\*\*
>  (3) If the third felony is such that upon a first conviction, the offender would be punishable by imprisonment for any term less than his natural life then:
> (a) The person shall be sentenced to imprisonment for a determinate term not less than two-thirds of the longest possible sentence for the conviction and not more than twice the longest possible sentence prescribed for a first conviction.
> \*\*\*
> G. Any sentence imposed under the provisions of this Section shall be at hard labor without benefit of probation or suspension of sentence.

As stated above, the defendant was found guilty of manslaughter. Thereafter, he was adjudicated a third-felony offender and was sentenced to serve 50 years at hard labor without the benefit of probation or suspension of sentence.  Two-thirds of 40 years, the maximum sentence for manslaughter, is 26.67 years; two times 40 years is 80 years. Thus, the defendant's sentencing exposure was not less than 26.67 years, nor more than 80 years. The sentence imposed, 50 years, falls near the midrange of the maximum sentence of 80 years.

We find that that the trial court adequately complied with La. C.Cr.P. art. 894.1.  Prior to imposing the sentence, the trial court stated that it had "considered all the circumstances" of this matter, specifically noting the

manner in which the victim was killed, the defendant's lack of remorse, the likelihood that the defendant would commit another offense, and the safety of the community. Further, the record reveals that the defendant's conduct, shooting the victim multiple times at close range, manifested deliberate cruelty. Consequently, we find that the sentence of 50 years for the shooting death of the victim is not grossly disproportionate to the seriousness of the offense and does not shock the sense of justice; the defendant's sentence is not constitutionally excessive.

## ERRORS PATENT

In accordance with La. C. Cr. P. art. 920, all appeals are reviewed for errors patent on the face of the record. A review of the record herein reveals one error.

The trial court denied the defendant's motions for new trial and post-verdict judgment of acquittal in open court on June 28, 2018, the day the sentence was imposed. There is no indication in the record that the defendant expressly waived the sentencing delay.

La. C. Cr. P. art. 873 provides:

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

When the defendant makes no showing of prejudice, the trial court's failure to observe La. C. Cr. P. art. 873 is a harmless error, and there is no need to remand for resentencing. *State v. Sermons*, 41,746 (La. App. 2 Cir.

14

2/28/07), 953 So.2d 958, *writ denied*, 2007-0789 (La. 11/2/07), 966 So.2d 601; *State v. Moossy*, 40,566 (La. App. 2 Cir. 3/10/06), 924 So.2d 485.

In this case, the defendant did not object to the trial court's failure to observe the delay and did not raise the issue on appeal. Upon denying the defendant's motions, the trial court noted the defendant's objection to its ruling and proceeded with sentencing. After hearing arguments with regard to whether the 2017 amendment to the habitual offender statute applied, the trial court indicated that it was ready to impose the sentence. Defense counsel replied, "We're ready, Judge," and did not object to the court's failure to observe the sentencing delay.

Our review of the record reveals no showing of prejudice to the defendant. Thus, the trial court's failure to observe the statutory requirement with regard to sentencing delays was harmless error.

## CONCLUSION

For the foregoing reasons, the defendant's conviction and sentence are affirmed.

**AFFIRMED.**